**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JOSEPH E. BUSKE, SR.,

                                          Plaintiff,

            v.                                                    No. 5:15-CV-330
                                                                  (MAD/CFH)
CAROLYN W. COLVIN, Commissioner
of Social Security Administration,

                                          Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

STANLEY LAW OFFICES, LLP                  JAYA A. SHURTLIFF, ESQ.
215 Burnet Avenue
Syracuse, New York 13203
Attorneys for Plaintiff

Social Security Administration            DANIEL R. JANES, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant


**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER

        Plaintiff Joseph E. Buske, Sr. ("plaintiff") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner" or "defendant") denying his applications for supplemental security

income benefits ("SSI") and Disability Insurance Benefits ("DIB").  Plaintiff moves for a

finding of disability, and the Commissioner cross moves for a judgment on the

pleadings.  Dkt. Nos. 11, 16.  For the following reasons, it is recommended that the matter be remanded.

## I.  Background

Plaintiff, born on November 3, 1963, applied for Social Security Disability insurance benefits ("SSD") as well as Supplemental Security income benefits ("SSI") on February 12, 2013 and February 5, 2014, respectively, alleging a disability onset date of September 17, 2012.  T[1] at 126-27, 143-48.  Those applications were denied on April 12, 2013.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held before ALJ Marie Greener on August 25, 2014.  T at 7, 27-53.  Plaintiff's timely request for review was denied, making the ALJ's findings the final determination of the Commissioner.  T at 1-3.  This action followed.  Dkt. No. 1 ("Compl.").

### A.  **Facts**[2]

#### 1.  **Plaintiff's Hearing Testimony**

Plaintiff testified that he drive approximately one hour to the hearing, and when he got out of his car, his "back was in pain."  T at 31.  Plaintiff is left-handed, writes and eats with his left hand, but completes a variety of other tasks with his right hand.  Id.

---

[1]  Citations to the administrative transcript are preceded by "T", followed by page number.

[2]  The following are not findings of fact of this Court, but are a iteration statements made by plaintiff or the vocational expert in order to provide a background for this case.

Plaintiff last worked in July 2001, driving a dump truck for Joe Losurdo Excavation.  Id. at 32, 224, 230.  He would perform minor repairs on the trucks and occasionally needed to change a tire.  Id. at 33.  Plaintiff testified that his job working for Losurdo Excavation ended because of the recession and because "[t]he work ended."  Id.  Plaintiff also testified that "it was also a point of where I almost couldn't pick up the coffee cup with the right hand."  Id.  Prior to working for Joe Losurdo Excavation, plaintiff worked for Northern Aggregates for a year and a half driving a dump truck.  Id. at 35.  In 1998, plaintiff worked for Lasorda Wire as a machine operator's helper where he would sometimes need to lift and "chisel" scrap wire onto a reel.  Id.

Plaintiff described driving his son to college orientation in Ohio in July of that year.  T at 38.  The drive took nine hours each way, and plaintiff needed to stop to stretch on five occasions.  Id.  When he "got to the hotel, [he] was almost in tears because [his] back hurt so bad."  Id.  Plaintiff explained that, while he was still working in his dump truck driving job, he would need to get out of the truck once every hour, "go probably 20 to 30 steps before I can straighten up, stretch my back, loosen up, then get back in the truck and drive."  Id.  When asked how long he could stand for one time, plaintiff stated that "it would depend on the condition that my back is in when it would be required," but noted that "there are days that there is no way that I could stand there for a long period of time."  Id. at 38-39.

Plaintiff testified about his treatment with a chiropractor, Richard J. Tesoriero, D.C.  T. at 39.  Plaintiff reported that workers' compensation requires him to go to twenty chiropractor visits before they will pay his provider, but plaintiff has trouble going

3

to twenty visits due to the cost of gas money.  Id.  However, when his back gets bad, he

will go.  Id.  Plaintiff testified that he has lied to Dr. Tesoriero about his pain level,

telling Dr. Tesoriero that his pain is at a level one or two when it is actually higher.  Id. at

40-41.  Id.  Plaintiff lied to Dr. Tesoriero because, if he would have told Dr. Tesoriero

that his pain is "an eight or a nine and he doesn't adjust me, then I can't sleep, I can't

get up, I can't walk."  Id. at 41.

Plaintiff testified that his youngest son helped with the household chores, but that

his son was moving away for college a few days after the hearing.  T. at 41.  Plaintiff's

son would wash dishes, sweep the floor, and vacuum.  Id. at 48.  Plaintiff opined that,

once his son moves out of the home, he will be responsible for the housework and

indicated that "[i]t's just going to take longer."  Id.  When plaintiff vacuums, his shoulder

starts to burn and he will need to stop.  Id.  When he sweeps, his back will burn,

requiring him to stop.  Id.  Plaintiff testified that taking laundry out of the washing

machine irritates his back and left shoulder.  Id. at 41.  Doing dishes can cause him

back pain, as well, depending on the condition of his back.  Id.  Plaintiff can sweep or

vacuum half of the floor and then will need to take a break because his back or

shoulder will start to hurt.  Id.  Plaintiff shops for groceries, but has difficulty carrying the

groceries into the house.  Id.  He can only carry a few things at a time – "one gallon and

a few bags in the other hand . . . ."  Id. at 42.

Plaintiff used to drive race cars as a hobby, but does not do this any more

because if he were to be "hit hard enough, they're going to be taking me out of the car

on a backboard.  They're going to call an ambulance."  T at 42.  Instead, plaintiff

watches his sons race cars at the speedway.  Id.  Plaintiff testified that he attempts to work on his race car, but his sons will not allow him to do the work because they see that he is in pain.  Id.  Plaintiff testified that he cannot shift gears and turn the wheel of a dump truck any longer.  Id. at 45.  Shortly before he stopped working, he had right elbow pain because he had to constantly shift gears with his right hand.  Id. at 46.  The steering wheel on the dump truck is a "full arm's length away" from plaintiff, and his "left shoulder will not allow [him] to go that full-length to go across the top of that steering wheel if [he is] shifting the truck while [he is] turning the wheel."  Id.  Plaintiff explained that when he is driving his personal truck, he can use two hands to turn the wheel fully, but that he "do[esn]'t have the second had to turn the wheel in the dump truck if [he's] shifting."  Id.

Plaintiff testified that he does not want to go to an orthopedic surgeon because he has already had two surgeries on his right elbow, which "w[ere]n't successful," and his mother had rotator cuff surgery that "wasn't successful."  T at 48-49.  Plaintiff also spoke of having four surgeries in the last two years, and stated that he had a bad reaction to the anesthesia.  Id. at 49.  He testified that he "really do[esn]'t know if [he] want[s] to be cut open again."  Id.  Dr. Humphrey informed plaintiff that the "downtime" for rotator cuff surgery would be four to six months, which would require him to "seek assistance for that four to six months as far as cleaning my house, getting my groceries, or I got one bad elbow."  Id.  Plaintiff takes ibuprofen to "keep the inflammation out of the shoulder," but reported that he "do[esn]'t know if it's helping or not."  Id.  Plaintiff took meloxicam, in pill form, for his shoulder pain, but it did not work.  Id. at 50.  He then

took samples of Celebrex, which reduced the swelling completely within one month, but eventually, it stopped working.  Id.  "[R]ather than continue to take medication that's not necessary . . . [plaintiff] stopped taking the Celebrex because it stopped working."  Id.  Plaintiff uses a cream compound for his left elbow that contains Meloxicam and other ingredients.  Id.  Plaintiff reports, "[p]utting it [the cream] on the elbow, the next day it's better."  Id. at 50.

Plaintiff reported that he gets pain in his left shoulder blade that is "like somebody has got a knife that is cherry, cherry red hot.  And it goes in there, and he just keep [sic] turning and turning and turning."  T at 51.  To "[a]ppease comp [workers compensation], it has to be upper middle back," to get chiropractic treatment.  Id.  Plaintiff's chiropractor "adjusts it; it takes care of it."  Id.  Plaintiff did not want to take narcotic pain medication because he "do[esn]'t like the feeling[,]" "being all messed up in the head[,]" and because he believes "[i]t doesn't help [him.]"  Id. at 52.

2.  **Opinion Evidence**

a. **Dr. Mark A. Humphrey, Oswego Family Physicians**

On May 10, 2011, plaintiff visited Dr. Humphrey for a "lump" on his right elbow.  T at 245.  On January 1, 2013, plaintiff experienced right elbow pain, reported that he was doing worse, and stated that it was painful to drive stick and lift as much as a half of a gallon of juice.  Id. at 249.  Plaintiff's elbow was "normal to inspection," his strength was a five out of five, he had "full ROM, "grip strength 3/6" on his right, and grip strength of five out of six on his left."  Id. at 250.  Plaintiff was comfortable during the exam.  Id.

On January 30, 3013, plaintiff reported that he has back pain that he "wants documented so he can get disability." Id. at 251. Plaintiff described this back pain as "jabbing pain," that does not radiate. Id. The pain is aggravated by movement. Id. Plaintiff reported no numbness, tingling, or weakness. Id. The doctor indicated that plaintiff has pain and numbness when crossing his left leg. Id. Plaintiff reported that he cannot sit in his truck or use the clutch. Id. Plaintiff further reported left gluteal pain, with radiculopathy to the foot. Id. Dr. Humphrey reviewed a lumbar spine MRI "done by Dr. Teseriro" which he reported shows "bulging discs in L4/L5 and right sided foramena impingement. Central stenosis L4/L5." Id. Upon physical examination of his spine, plaintiff's "landmarks [we]re equal and spine contour [was] normal." Id. at 252. There was mild tenderness of spine bilaterally. Id. Plaintiff experienced strength of five out of five, his heel to toe walk was normal, and he could get up on his tiptoes. Id. Plaintiff had a negative left straight raise test, and positive right leg raise test. Id. Dr. Humphrey reported a 33% temporary impairment. Id.

On February 20, 2013, plaintiff reported an aching pain in his right elbow. T at 253. The pain has improved since he stopped driving stick shift. Id. Plaintiff's elbow was normal to inspection, strength was five out of five in both upper extremities, with normal muscle tone. Id. at 254. Plaintiff's grip strength was "+3/6 vs the right +5/6 left." Id. Plaintiff had full range of motion in his right and left elbows, but in his right elbow it was "painful to palpation over radial head." Id.

Dr. Humphrey completed a medical source statement on August 22, 2014. T. 373. Dr. Humphrey reported that he has treated plaintiff for the past five years and

sees him every three to four months.  Id.  Dr. Humphrey diagnosed right elbow pain, left

shoulder pain, lumbago, and left leg radiculopathy from "severe disc disease."  Id.

Dr. Humphrey provided that plaintiff could walk two city blocks without feeling pain or

needing rest.  Id.  He could sit for fifteen to twenty minutes at one time.  Id.  He could

stand for fifteen or twenty minutes at a time.  Id.  Plaintiff could stand or walk for less

than two hours total in an eight-hour work day.  Id.[3]  Plaintiff does not need a job that

permits shifting positions at will.  Id.  Dr. Humphrey reported that plaintiff need four to

five unscheduled twenty minutes breaks during a work day.  Id. at 374.  When asked if

plaintiff needs a cane, Dr. Humphrey indicated "no," and wrote in the margin, "not yet."

Id.  Plaintiff can occasionally lift under ten pounds, and rarely lift up to fifty pounds.  Id.

Dr. Humphrey reported that plaintiff could: frequently use hands to grasp/turn/twist and

perform fine manipulations; occasionally look down and hold his head in a static

position; rarely turn his head left or right or look up; rarely reach; rarely twist, stoop,

crouch/squat, and climb stairs; and could never climb ladders.  Id.  He reported that

plaintiff has good and bad days, and would miss more than four days of work per

month.  Id.  Finally, Dr. Humphrey reported that plaintiff's pain is rarely severe enough

to interfere with his attention and concentration.  Id.


### b.  Richard J. Tesoriero, Chiropractor

---

[3]  As the ALJ points out, T at 18-19, Dr. Humphrey's MSS reflects that he originally circled that
plaintiff could sit for more than two hours, stand for more than two hours, and could sit/stand/walk for at
least six hours; however, these limitations were crossed out and initialed and Dr. Humphrey indicated
instead that plaintiff could sit and stand for fifteen to twenty minutes each, and sit/stand/walk for less than
two hours in an eight-hour work day.  T. at 373.

Plaintiff visited Dr. Tesoriero on the following dates, plaintiff's reported pain levels are indicated. On February 8, 2012, plaintiff had a flare up of his low back pain. T at 261. On February 10, plaintiff reported his pain was at a level of three out of ten, and when it is at its worst, it is a six. Id. He reported feeling "better" and stated he could do more around the house. Id. at 262. On February 14, plaintiff's reported pain level was three, and at worst, six. Id. On February 17, plaintiff's pain level was a one, Dr. Tesoriero reported "25% disability status." Id. On March 2, plaintiff's pain was a four. Id. at 263. On March 7, 2012, plaintiff's pain was a one. Id. On March 21, plaintiff's pain was a one, and Dr. Tesorerio reported that he "do[esn]'t expect further improvement." Id. at 264. On May 18, plaintiff reported that his pain was a four. Id. On May 22, plaintiff's pain was a two. Id. at 265. On May 25, plaintiff's pain was a one and plaintiff reported, "I am better." Id. On October 29, plaintiff's pain was at a level of six to eight, he reported a "flare up," but did not know what caused it. Id. He also reported worsened right elbow pain, and noted that stretching helped. Id.

By October 31, 2012, plaintiff was "feeling much better," "less pain and less spasms," "it's not radiating down the leg as far." T at 266. Plaintiff's pain was at a level of two, and at worst, a four. Id. On November 2, plaintiff reported that sitting down aggravated his pain. Id. His pain was at a level of four, at worst, it was at six. Id. His low back pain was an "aching" pain. Id. On November 6, plaintiff's pain was a two and still was an aching pain in his lower back. Id. at 267. On November 16, plaintiff's pain was a one, at worst, a four. Id. On November 30, plaintiff's pain was a one, at worst, a three. Id. at 267-68. On February 19, 2013, plaintiff reported that his pain increased,

he could not sleep, and woke up with low back pain that radiated to his right leg.  Id. at 268.  He reported the pain was at a three, at worst, a six.  Id. at 268.  On February 20, pain was a one, his worst pain was a three, and plaintiff reported that he could stand at sink and do dishes with no pain.  Id. at 268-69.  On February 22, pain was a one, at worst a three.  Id. at 269.  On February 25, pain was a one, and it was an aching pain.  Id.  On March 1, plaintiff reported that he experienced exacerbation of low back pain when he bent over and his pain was at a three, at worst a five.  Id. at 305.  On March 6, plaintiff's pain was a two, at worst a four.  Id.  He reported that "some days are better than others," and that chiropractic care improves his pain, while housework, doing dishes, sleeping, and "living" worsened it.  Id.  On March 12, his pain was a two, at worst a four.  Id. at 305.  On March 20, pain was at a level of three, at worst a five.  Id. at 306.  On April 10, plaintiff reported that his pain was a one, and because his pain was at a level of one, Dr. Tesoriero reported that he was closing plaintiff's case.  Id. at 307.

Nearly a year later, on April 7, 2014, plaintiff returned to Dr. Tesoriero reporting an exacerbation of low back pain.  T at 307.  He reported that he "woke up this way." Id.  Pain was reported to be a five, and at worst, a seven.  Id.  On April 9, plaintiff reported a slight improvement.  Id.  He reported a "knife like pain in left scapula."  Id. Plaintiff's pain was a four, at worst a six.  Id. at 307-08.  His pain is "aching, burning and stabbing."  Id. at 308.  On April 11, plaintiff's pain was a four, at worst, a six.  Id. at 308. On April 15, plaintiff's pain was a three, at worst a four, and it feels like a "stabbing and burning pain," but does not feel as "knife like as it was."  Id.  On April 18, plaintiff's pain

was a two, at worst, a four, and it felt better than it did at the last visit.  Id. at 309.  The pain was still an aching, burning, or stabbing feeling.  Id.  On April 23, plaintiff's pain was a two, at worst a four.  Id.  Plaintiff reported that the pain was "aching," and that stretching and exercises make it feel better.  Id.  On April 30, plaintiff's pain was a two, at worst, a six.  Id. at 309-10.

In a "patient progress report" completed for workers' compensation on February 18 and 20 of 2013, Dr. Tesoriero reported that plaintiff had a "25% impairment" and noted that plaintiff was working, "no restrictions."  T at 315-16, 319-20.


### c.  Kevin Setter, M.D., Upstate Orthopedics Ambulatory Surgery Center

On May 1, 2013, plaintiff underwent "elbow extensive debridement," "right elbow synovectomy of elbow joint," and "injection of right elbow with 80mg of depro-medrol." T 274.  On November 20, 2013, plaintiff underwent "right elbow denervation procedure," "right elbow posterior interosseous nerve release," and "right elbow lateral epicondylar release with epicondyle debridement and tendon reattachment."  Id. at 277. On November 29, 2013, Dr. Setter reported that plaintiff was "doing exceptionally well after elbow arthroscopic ECRB debridement.  However, his pain returned with a vengeance." T at 292.  On December 3, 2013, Dr. Setter noted that plaintiff was "still with pain" and was "[t]otally disabled, until further notice."  Id. at 289.

On February 3, 2014, plaintiff was experiencing "right elbow pain."  T at 285. Plaintiff reported that "Mobic" did not help, and that Celebrex helped, but was not

approved by his insurance.  Id.  By April 13, 2014, plaintiff "still has discomfort and difficulty with any lifting or gripping[,]" "[t]enderness to the lateral epicondyle[,]" and "good range of motion with discomfort."  Id.  At a April 13, 2014 follow-up visit, plaintiff reported experiencing right elbow pain.  Id. at 281.  Plaintiff was "using compounded pain cream, which is [sic] been helping significantly."  Id.  Dr. Setter recommended that plaintiff "[c]ontinue with physical therapy."  Id.  Dr. Setter's impression was "continued elbow pain, but improving.  Continue with physical therapy."  Id.


### d.  David Harning, Vocational Rehabilitation Counselor

Mr. Harning served as plaintiff's vocational case worker.  T at 192.  In a March 5, 2013 "confidential health assessment," which appears to have been submitted as part of plaintiff's application for services from the Office of Adult Career and Continuing Education Services, plaintiff reported his health to be "good."  T at 219.  He also reported "no difficulty" with walking, sitting, climbing stairs, crawling, using right and left foot and leg, using left hand/arm, moving fingers, doing arithmetic, and working with people.  Id.  Plaintiff reported some difficulty standing, sitting, squatting, using his right hand and arm, reaching above shoulders, hearing, seeing, pushing, pulling, carrying, lifting, and reading.  Id.  Plaintiff reported that he "cannot do" squatting, or use his right hand or arm.  Id.  Plaintiff reported that he could work full time.  Id. at 220.  In an apparently separate application for vocational rehabilitation services, also dated March 5, 2013, plaintiff reported that he cannot: lift forty pounds, sit for long periods of time,

12

squat, work with his elbow, use his elbow to pick up anything over three pounds, or bend over.  Id. at 223.  Plaintiff provided that he needed "employment with above poverty income.  Need to go from bullwork to pushing a pencil so to speak."  Id.

In April 2013, plaintiff reported that he was interested in returning to work as a general laborer, with a goal of returning to such work by June 1, 2013.  T at 200.   On May 6, 2013, plaintiff was "receptive to the vocational goal . . . of finding work as a general laborer but is open to alternate employment if its [sic] within his restrictions." Id. at 367.  Mr. Harding noted that plaintiff shared that he was "assisting his son with 'go-cart' racing" and opined that "[it] appears that [plaintiff] does quite a lot of activity which exceeds his physical restrictions; for instance, he spoke of running a chainsaw and changing tires."  Id. at 368.  On plaintiff's intake form Mr. Harding indicated that plaintiff was "restricted from lifting 'heavy weight' which was noted to be no more than 20 pounds, no driving longer than 30 minutes and no repetitive use of the right extremity for heavy lifting."  Id. at 370.

On December 23, 2013, plaintiff's "work goal" was to return to work as a general laborer by June 1, 2014.  T at 197.  In a case note dated July 3, 2013, Mr. Harding reported that plaintiff was "preoccupied with setting up his pool at the beginning of June . . . This is probably something that he is not supposed to be doing physically, but claims that his son needs something to do during the summer."  Id. at 365.  On June 4, 2013, plaintiff "called case manager and left a threatening and irate message on the machine that he needs to find a job as soon as possible."  Id.  Mr. Harding indicated that plaintiff "would not be good at a desk job although he claims that is all he can do."

13

Id. In a June 4, 2013 case note, Mr. Harding reported that plaintiff shared that he "spoke with someone in an insurance office regarding possible opportunities." Id. at 366.

### 3. Imaging Studies

### a. Lumbar Spine

On December 6, 2010, plaintiff had a lumbar spine MRI taken. T at 256. The MRI showed "normal lumbar lordosis," "normal vertebral body heights/alignment/narrow signal," loss of normal disc space at L3-L4 and L4-L5," "disc desciccation changes" at L3-L3, "broad-based concentric disc bulge is identified, resulting in mild central spinal canal stenosis, without significant foraminal narrowing." Id. At L4-L5, "right paracentral and right lateral disc protrusion is identified, resulting in narrowing of the right lateral recess and mild narrowing of the right L4-L5 neural foramen. The disc protrusion abuts the exiting right L4 and L5 nerve roots." Id. "Remainder of lumbar levels demonstrate no evidence of disc herniation, spinal canal stenosis, or neural foraminal narrowing. No paravertebral or epidural mass is seen. The conus appears unremarkable." Id. at 257. The impression was "mild central spinal canal stenosis at L3-L4, secondary to a broad-based concentric disc bulge. Mild right lateral recess stenosis and mild right neural foraminal narrowing at L4-L5, secondary to a right paracentral and right lateral disc protrusion, which abuts the exiting right L4 and L5 nerve roots." Id.

Plaintiff had a second MRI of the lumbar spine taken on March 13, 2014. T at 314. The impression was

[d]egenerative disc changes, most pronounced at L3-4 and L4-5 the L4-5 findings are comparable to prior of predominately involve right lateral recess and formaminal canal. At L3-4, there is progression of reactive endplate change and size of disc protrusion involving L lateral recess of neuroforamen. No new central disc herniation.

Id.[4]

### b. Right Elbow

Plaintiff underwent an right elbow MRI on March 1, 2013. T at 338. The impression was

1. Partial intrasubstance tear of proximal fibers of the common extensor tendon and underlying bone bruising of lateral epicondyle. There is also fraying of the proximal fibers of the radial collateral ligament.
2. Mild edematous changes of the ulnar nerve in the cubital tunnel: Is there focal discomfort?
3. Mild edematous change associated with the proximal fibers of the anterior bundle of the medial collateral ligament.
4. No evidence for acute/old radial head fracture.

Id.

---

[4] The MRI report further provided, at L3-L4, there was "slightly increased disc protrusion into the left paramedial and foraminal location." Id. Further, the MRI revealed "[m]oderate disc space dehydration and collapse. There is now slightly decreased disc protrusion into left paramedian and foraminal location. Id. Further, at L3-L4, there was "moderate left foraminal narrowing where previously this was mild." Id. New signal within the annulus indicative of annular tearing. Now moderate left foraminal narrowing where previously this was mild." Id. The conus was "normal," and the x-ray showed "multiple areas of marrow signal change secondary to degenerative disc reaction." Id. The MRI was reported to be similar to the December 2010 MRI "other than the posterior aspect of L3-4, and extending eccentrically to the left which is definitely worsened. No compression fractures, spondylolisthesis." Id. Additionally, "L1-2 and L2-3 show normal disc space height and hydration, no canal stenosis, disc herniation, or foraminal narrowing, at L3-4 a broad-based disc bulge is again noted." Id. "At L4-5 disc space partially collapsed dehydrated similar to prior. Broad-based bulge. Superimposed eccentric disc protrusion into the right foraminal origin extending through the foramen laterally. This mildly narrows the neural foramen. No significant interval change." Id. The "L5-S1 disc space height and hydration is normal. No disc herniation, canal stenosis, or foraminal narrowing." Id.

### c. Right Forearm, Orbitals, and Left Shoulder

On January 15, 2013, plaintiff had a right forearm X-ray taken. T at 255. The impression was "normal right forearm radiographs." Id. Plaintiff also underwent an orbital MRI on March 1, 2013. Id. at 340. The impression of the MRI was "no metallic foreign body identified." Id. On June 20, 2014, plaintiff had left shoulder radiographs taken. Id. at 360. The images showed "osseous and articular structures are normal, no significant soft tissue abnormalities are present; impression: normal examination." Id.

### II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). If supported by substantial evidence, the Commissioner's finding must be sustained, "even where substantial evidence may support the plaintiff's position and

despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

## B. Determination of Disability[5]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

---

[5] Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec 'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g), as amended; Halloran, 362 F.3d at 31. Thus, as long as it is supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). A Court may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

### C. ALJ Determination

Applying the five-step disability sequential evaluation, ALJ Greener determined that plaintiff met the insured statues requirements of the Social Security Act ("SSA") to remain insured through December 30, 2016 and had not engaged in substantial gainful activity since September 17, 2012, the alleged disability onset date. T at 13. The ALJ

determined that plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine and right elbow lateral epicondylitis[6] and synovitis.[7]  Id.  At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Id. at 14.

Before reaching step four, the ALJ concluded that plaintiff has the residual functional capacity ("RFC") to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), because the claimant is able to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  Additionally, the claimant is able to frequently reach with his upper right extremity.

Id. at 15.  At step four, the ALJ noted that, pursuant to 20 C.F.R. §§ 404.1565 and 416.965, plaintiff is unable to perform any past relevant work.  Id. at 19.  The ALJ noted that plaintiff was forty-eight years old, a younger individual, at the time of the alleged onset date, but "subsequently changed age category to closely approaching advanced

---

[6]  Lateral epicondylitis, or tennis elbow, "results from inflammation and microtearing of fibers in the extensor tendons of the forearm.  Symptoms include pain at the lateral epicondyle of the elbow, which can radiate into the forearm.  Diagnosis is by examination and provocative testing.  Treatment is with rest, NSAIDs, and physical therapy."  The Merck Manual 3300 (19th ed. 2011).

[7]  The Merck Manual provides that there are two forms of synovitis: synovical chondromatosis and pigmented villonodular synovitis.  The Merck Manual 410 (19th ed. 2011).  Synovial chondromatosis is characterized by numerous calcified cartilaginous bodies in the synovium, which may be no larger than a grain of rice, in a swollen, painful joint.  Malignant change is very rare.  Recurrence is common."  Id.  Pigmented villonodular synovitis occurs where "[t]he synovium becomes thickened and contains hemosiderin, which gives the tissue its blood-stained appearance and characteristic appearance on MRI.  This tissue tends to invade adjacent bone, causing cystic destruction and damage to cartilage."  Id.  It is not plainly clear from the record to which condition the ALJ is referring.  However, this does not affect the undersigned's analysis, and The Merck Manual definitions are provided here solely to give context to the medical term "synovitis."

age." Id. at 20.  Next, the ALJ determined that, given plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  Id.  Thus, the ALJ concluded that plaintiff has not been under a disability from September 17, 2012 to the date of the decision.  Id. at 21.

### D.  Analysis

Plaintiff contends that the ALJ improperly assessed the medical opinion evidence, resulting in a residual functional capacity assessment ("RFC") that is not based "upon any medical source."   Dkt. No. 10 at 6, 11.  Plaintiff further argues that his nonexertional impairments that are more than negligible; thus, the ALJ was required to obtain testimony from a vocational expert ("VE").  Id. at 12.

### 1. Treating Physician's Rule

Under the "treating physician's rule," the ALJ must give "controlling weight" to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  20 C.F.R. § 404.1527(d)(2); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).  Although the treating physician rule need not be applied if the treating physician's opinion is inconsistent with opinions or other medical records, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the

opinion of the treating physician." <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008).

Even when the treating physician's opinion is not given controlling weight, an ALJ "must

consider various 'factors' to determine how much weight to give to the opinion[,]"

including: "(i) the frequency of examination and the length, nature, and extent of the

treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii)

the consistency of the opinion with the record as a whole; (iv) whether the opinion is

from a specialist; and (v) other factors . . . . " <u>Hallorhan</u>, 362 F.3d at 32 (quoting 20

C.F.R. § 404.1527(c)(2)).  The ALJ is also required to set forth his or her reasons for

the weight he or she assigns to the treating physician's opinion.  <u>Id.</u>  The Second Circuit

has stated that it will "not hesitate to remand when the Commissioner has not provided

'good reasons' for the weight given to a treating physician's opinion and we will continue

remanding when we encounter opinions from ALJs that do not comprehensively set

forth reasons for the weight assigned to a treating physician's opinion." <u>Halloran</u>, 362

F.3d at 33; <u>Brogan-Dawley v. Astrue</u>, 484 F. App'x 632, 633 (2d Cir. 2012).  However,

"where the evidence of record permits [the court] to glean the rationale of an ALJ's

decision," the ALJ need not "have mentioned every item of testimony presented to him

[or her] or have explained why he [or she] considered particular evidence unpersuasive

or insufficient to lead him [or her] to a conclusion of disability." <u>Petrie v. Astrue</u>, 412 F.

Appx. 401, 407 (2d Cir. 2011).  Ultimately, the final determination of disability and a

claimant's ability to work rests with the Commissioner.  <u>Snell v. Apfel</u>, 177 F.3d 128,

133-34 (2d Cir. 1999); 20 C.F.R. § 404.1527(e) (2005).

  The ALJ accorded "minimal weight" to an August 2014 "check box" medical

source statement from Dr. Humphrey because it is not consistent with the overall evidence, including the claimant's reported activities of daily living and his own opinions from March 2013 as well as the opinions of Chiropractor Tesoriero and Mr. Harning." T at 18-19. The ALJ assigned significant weight to Dr. Humphrey's March 2013 opinion which stated that plaintiff was limited by low back pain and right elbow pain, and opined that plaintiff could not lift greater than twenty pounds, drive for more than thirty minutes at one time, or squeeze the right elbow. Id. at 18. He also accorded "significant weight" to Dr. Tesoriero's April 2013 opinion that plaintiff should avoid excessive lifting and extended sitting. Id. at 18. The ALJ explained that significant weight was accorded to Dr. Humphrey's March 2013 opinion and Dr. Tesoriero's opinions due to their "expertise and the relative consistency of these opinions with the overall medical evidence." Id.

The ALJ assigned "no weight" to the December 2013 treatment note of Kevin J. Setter, M.D., plaintiff's orthopedic surgeon, which indicated that plaintiff is "totally disabled." T at 19. The ALJ noted that he afforded no weight to Dr. Setter's opinion because it was:

> not supported by an appropriate function-by-function
> assessment of the claimant's work-related abilities, because
> it is an opinion on an issue reserved to the Commissioner,
> because it was issued approximately two weeks after the
> claimant's second elbow surgery, and because it is
> inconsistent with the longitudinal medical evidence in the
> record, including the March 2013 opinion of Dr. Humphrey
> and the opinions of Chiropractor Tesoriero and Mr. Harning.

T at 19. The ALJ gave significant weight to the "statements and observations" of David Harning, plaintiff's vocational rehabilitation caseworker, that plaintiff was restricted from lifting over twenty pounds, driving more than thirty minutes, and could not repeatedly

use his right extremity for heavy lifting.  Id. at 18.  The ALJ afforded Mr. Harning's statements and observations significant weight "due to the treating relationship with the claimant, his vocational expertise, and the consistency of his statements and observations with the overall evidence."  Id. at 19.

### a.  Dr. Mark Humphrey, D.O.

Plaintiff argues that the ALJ erred in declining to afford controlling weight to the opinions of Dr. Humphrey, his primary care provider, set forth in his August 2012 MSS. Dkt. No. 10 at 8.  He contends that the ALJ failed to cite substantial evidence to contradict Dr. Humphrey's opinion.  Id.  Further, plaintiff argues that the ALJ "does not acknowledge that the objective testing supports Dr. Humphrey's reports."  Id.  Plaintiff also argues that the ALJ erred in lessening the weight afforded to Dr. Humphrey's medical source statement ("MSS") due to his use of a check-box form.  Additionally, plaintiff asserts that the ALJ erred in faulting Dr. Harding for crossing out a box indicating a lesser limitation on plaintiff's ability to sit/stand/walk, and choosing one with greater limitation, but failing to re-contacting Dr. Humphrey to obtain an explanation for this change.  Id. at 9-10.

### i.  Inconsistency Between Dr. Humphrey's March 2013 Opinion and August 2014 MSS

One reason the ALJ gave for rejecting Dr. Humphrey's function report is because it is inconsistent with "his own opinions from March 2013 as well as the opinions of

Chiropractor Tesoriero and Mr. Harning." T at 18-19. Addressing first, Dr. Humphrey's March 2013 opinion, Dr. Humphrey opined in a treatment note that, with regard to plaintiff's right elbow pain, plaintiff's prognosis with analgesic treatment was "unknown," and without treatment, "poor." Id. at 336. He further provided that plaintiff must avoid heavy lifting, driving over thirty minutes, and "squeezing with tendon because R elbow torn ligament." Id. The ALJ pointed out that the August 2014 MSS conflicted with Dr. Humphrey's March 2013 treatment note, which indicated lesser limitations, and cited this as a reason to accord the August 2014 MSS little weight.

The undersigned does observe that this March 2013 opinion was made before both of plaintiff's elbow surgeries. Medical notes indicate that although plaintiff was improving following his two surgeries, he still had pain in his right elbow "with motion of the wrist flexion and extension." T at 281, 285, 292. Where an ALJ perceives inconsistencies in a treating physician's report, the ALJ has duty to recontact the physician to seek clarification. Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998); see also 20 C.F.R. §§ 404.1212(e)(1), 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source ... does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."); Goodale v. Astrue 32 F. Supp. 3d 345, 359 (N.D.N.Y. 2012). (""[T]he ALJ's responsibility to resolve conflicts in the evidence would be 'rendered nugatory if, whenever a treating physician's stated opinion is found to be unsupported by the record, the ALJ were required to summon that physician to confirm his [or her] opinion to the evidence.'") (citation omitted). Here, where the ALJ identified an

apparent inconsistency between Dr. Humphrey's August 2014 MSS and his treatment notes, especially where plaintiff has undergone two intervening surgeries between the two opinions, his failure to recontact Dr. Hupmhrey was error.  <u>Rice ex rel. T.C.K. v. Astrue</u>, 32 F. Supp. 3d 113, 121 (N.D.N.Y. 2012).  Accordingly, it is recommended that this matter be remanded, and on remand, that the ALJ obtain an opinion from the ALJ regarding the basis for his apparent inconsistencies between the March 2013 and August 2014 opinions.[8]

### ii. Limitations not found in Medical Evidence

In reviewing the August 2014 MSS, the ALJ noted that Dr. Humphrey found serious limitations that do not have the support of objective medical evidence.  T at 19. For instance, as noted by the ALJ, Dr. Humphrey opines that plaintiff can rarely turn his head left or right or look up and only occasionally look down and hold his head in a static position, yet the medical records contain no evidence of limitations regarding plaintiff's neck and there are no treatment notes indicating any such neck limitations. <u>Id.</u> at 245-57; 373-75.  In response to a question asking "[t]o what degree can [plaintiff] tolerate work stress," Dr. Humphrey indicated that plaintiff is not capable of even low stress jobs.  <u>Id.</u> at 373.  However, there is no indication as to why plaintiff would be unable to engage in even low-stress jobs.

Although an opinion of a treating physician is generally entitled to controlling

---

[8]   The ALJ's regulatory obligation to develop the administrative record exists even when the claimant is represented by counsel or by a paralegal at the hearing.  <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999).  Here, plaintiff was represented by a non-attorney representative at the hearing.

weight, this standard does not apply where the opinions are not supported by objective clinical or diagnostic support.  Hallorhan, 362 F.3d at 31-32.  Here, as the record appears void of any objective findings or any discussion of diagnostic testing indicating that plaintiff had significant neck limitations or an inability to tolerate work at any stress level, such findings were not entitled to any significant weight.  However, as noted above, the ALJ has an "affirmative duty to develop the record and seek additional information from the treating physician, sua sponte," to determine upon what information the treating source was basing his opinions.  Colegrove v. Comm'r of Soc. Sec., 399 F. Supp. 2d 185, 196 (W.D.N.Y. 2005).  Additional evidence or clarification is sought when there is a conflict or ambiguity that must be resolved, when the medical reports lack necessary information, or when the reports are not based on medically acceptable clinical and laboratory diagnostic techniques.  See 20 C.F.R. § 404.1512(e)(1).

Here, it is not clear from Dr. Humphrey's MSS or his medical treatment notes why he indicated such significant limitations on plaintiff's use of his head and neck or in his ability to work in even low stress environments.  The record contained several treatment notes from Dr. Humphry.  Those treatment notes largely involved complaints of elbow pain and some lower back pain. T at 336-59.  Those treatment notes do not appear to include clinical testing of plaintiff's ability to move his neck.  See id.  Plaintiff reported shoulder pain in a June 2014 visit with Dr. Humphrey, but there is no indication the pain impacts his neck or head, as the only limitations reported that he could not lift his arm above chest height.  Id. at 357.  Further, at his hearing, although plaintiff

discussed in detail his many alleged physical limitations and experiences with pain, plaintiff did not indicate any issues with his neck or limits on his ability to turn his head or hold it statically.  Id. at 28-53.   Although Dr. Humphry assessed these neck and stress limitations, it was appropriate for the ALJ to conclude that this opinion was inconsistent with the record and not based on objective medical evidence.  However there is insufficient medical evidence in the record from which the ALJ could conclude that these opined limitations do not exist; thus, the ALJ had a duty to recontact the treating physician or other medical source,  seek additional existing medical records, or perhaps ask plaintiff to undergo a consultative examination.  Cheek v. Commissioner of Soc. Sec., 14-CV-492 (TJM/ATB), 2015 WL 3857253, at *11 (N.D.N.Y. June 22, 2015) (quoting Perrin v. Astrue, 11-CV-5110 (FB), 2012 WL 4793543, at *3 n.3 (E.D.N.Y. Oct. 9, 2012)).

Accordingly, as Dr. Humphrey's physician's report was "insufficiently explained, lacking in support, or inconsistent with the physician's other reports," it is recommended that the matter be remanded and that, on remand, the ALJ inquire into the basis of these opined limitations.  Jimenez v. Astrue, No 12-CV-3477 (GWG), 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (citation omitted).


### iii.  Inconsistency with Activities of Daily Living

Next, the ALJ indicated that he assigned little weight to the opinion in part because it conflicted with plaintiff's activities of daily living.  T at 18-19.  Although, as plaintiff points out, medical records demonstrate that he repeatedly reported right

experiencing right elbow pain, T at 245-57, and by January 2013, found himself unable

to lift anything more than a half of a gallon of juice with his right hand, plaintiff reported

engaging in a variety of very physical activities during that time period, such as helping

his son with his go cart, going to the speedway to watch his sons race, using a chain

saw, changing tires in May 2013; setting up a pool in July 2013; using a wheelbarrow to

carry six loads in October 2013; and using a snow blower in March 2014.  Id. at 249,

350, 355, 365-67.  Similarly, his reports of back pain also varied, with a large number of

his visits to his chiropractor indicating pain levels at a one, two, or three.  T at 309-10.[9]

Thus, the ALJ did not error in according less weight to Dr. Humphrey's MSS due to its

apparent inconsistency with plaintiff's reported activities of daily living.


### iv.  Inconsistency with other Opinion Evidence[10]

Plaintiff argues that the ALJ erred insofar as he did "not rely[] upon any medical

source to establish the Residual Functional Capacity."  T at 11.  Plaintiff also argues

that the opinions of Dr. Tesoriero and Mr. Harding do not amount to substantial

evidence to overcome Dr. Humphrey's opinions because Dr. Tesoriero, a chiropractor,

_____

[9]  Although plaintiff indicates in his hearing testimony that he lied to Dr. Tesoriero about his true pain levels, apparently out of concern that Dr. Tesorerio would not adjust his back if he reported higher levels of pain, any credibility determination the ALJ may have implicitly reached as to these statements is properly within the purview of the ALJ.  T at 40-41.

[10]  Plaintiff does not explicitly address Dr. Setter's opinion in her argument beyond briefly noting that Dr. Setter's findings support Dr. Harding's August 2014 MSS. Dkt. No. 10 at 8. The undersigned finds that the ALJ reasonably rejected Dr. Setter's specific opinion as to the ultimate finding of plaintiff's disability.  This opinion, even though made by a treating physician, addresses an issue reserved for the Commissioner, and is not entitled to special deference.  Snell 177 F.3d at 133 ("That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating physician's statement that the claimant is disabled cannot itself be determinative.").

and Mr. Harding, a nonmedical source, are not acceptable medical sources and cannot alone be relied on to support the RFC assessment.  Id. at 11-12.

In reviewing Dr. Humphry's August 2014 MSS, the ALJ pointed out, among other things, that the MSS was inconsistent with Dr. Tesoriero's opinion.  Dr. Tesoriero, in an April 19, 2013 progress note, diagnosed plaintiff with lumbar intervertebral disc syndrome displacement.  T at 207.  In the April 2013 progress note, responding to plaintiff's prognosis "with treatment," Dr. Tesoriero referenced his April 10, 2013 treatment note.[11]  Id. at 207, 211.  As to plaintiff's prognosis without treatment, Dr. Tesoriero referenced his February 18, 2013 treatment note.  Id. at 207, 210.[12]  In the April 2013 progress note, Dr. Tesoriero also reported that he provided to plaintiff chiropractic adjustive treatment "with several home stretches, rehabilitative exercises and core exercises - release from care."  Id.  Regarding any activities or working conditions plaintiff must avoid, Dr. Tesoriero reported "[a]s with any chronic low back complaint no excessive lifting or extended periods of sitting."  Id.

The ALJ also noted that the August 2014 MSS was not consistent with vocational counselor Mr. Harning's opinion.  T at 19.  The ALJ accorded significant weight to Mr. Harning's April 2013 report indicating that plaintiff is restricted from lifting

---

[11]  In Dr. Tesoriero's April 10, 2013 treatment note, plaintiff had dorsal flexion of 95; extension of 35; lateral flexion of 30 to the left and right; trunk rotation of 30 to the left and right; and the ability to stand on heels and toes, stand on right leg flexed while lifting leg, and stand on left leg flexed while lifting right.  T at 207, 211.

[12]  In Dr. Tesoriero's February 18, 2013 treatment note, plaintiff had: "dorsal flexion 60 (95) with acute pain," "extension 35 (35) with acute pain; "lateral Flexion L30 (30) with pain"; "R30 (30) with pain"; Trunk Rotation L30 (30), R30 (3)."  T at 210  Plaintiff was able to stand on his right leg flexed while lifting his left leg, and stand on his left leg flexed while lifting his right leg.  Id.  Plaintiff had "[s]traight leg raise L(+) 30, R(+) 20."  Id.

more than twenty pounds, driving more than thirty minutes at one time, and could not engage in repetitive use of the right extremity for heavy lifting. Id. at 18. Mr. Harning's opinion was afforded such weight "due to his treating relationship with the claimant, his vocational expertise, and the consistency of his statements and observations with the overall evidence." Id.

There are five categories of "acceptable medical sources." 20 C.F.R. § 404.1513(a). Chiropractors are not included among the "acceptable medical sources" and their opinions are not entitled to special weight. Chiropractors are listed among the "other medical sources," whose opinion may be considered as to the severity of the claimant's impairment and ability to work. 20 C.F.R. § 416.913(d)(1). A vocational rehabilitation counselor would be considered an "other source." SSR 06-06p, Titles II and XVI:II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" In Disability Claims; Considering Decisions on Disability By Other Governmental and Nongovernmental Agencies, 2006 WL 2329939 (Aug. 9, 2006). Further, SSR 06-03p provides

> An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source. For example, this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of the individual's functioning over time and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole.

SSR 06-03p: Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions

on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL

2329939, at *6 (Aug. 6, 2006).   There are circumstances, "such as length of treatment,"

where "it may be appropriate for an ALJ to give more weight to a non-acceptable

medical source than a treating physician." Anderson v. Astrue, No. 07-CV-4969, 2009

WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009); Zurenda v. Astrue, No. 11-CV-1114

MAD/VEB, 2013 WL 1183035, at *6 (N.D.N.Y. Mar. 1, 2013) report and

recommendation adopted, 11-CV-1114 (MAD/VEB), 2013 WL 1182998 (N.D.N.Y. Mar.

21, 2013).  Further, information from

> 'other sources' cannot establish the existence of a medically
> determinable impairment.  Instead, there must be evidence
> from an 'acceptable medical source' for this purpose.
> However, information from such 'other sources' may be
> based on special knowledge of the individual and may
> provide insight into the severity of the impairment(s) and
> how it affects the individual's ability to function."

Id. at *3.  The Second Circuit has stated that "the ALJ has discretion to determine the

appropriate weight to accord the [other source's] opinion based on all the evidence

before him." Diaz, 59 F.3d at 313-14.   "[A]n RFC assessment is not considered to be

substantial evidence when it is not completed by a treating physician." Colon v. Astrue,

09-CV-6527, 2010 WL 2925969, at *3 (W.D.N.Y. July 23, 2012) (citing Fagon v.

Sullivan, No. 88-315, 1989 WL 280336 (D. Vt. Nov. 21, 1989)).

An RFC finding can withstand judicial scrutiny only if there is substantial

evidence in the record to support each requirement listed in the regulations. Martone v.

Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).  When assessing a plaintiff's RFC, the

ALJ "must first identify the individual's functional limitations or restrictions and assess

his or her work-related abilities on a function-by-function basis . . . . Only after that may

RFC be expressed in terms of the exertional levels of work, sedentary, light, medium,

heavy, and very heavy." SSR 96-8p, Police Interpretation Ruling Titles II and XVI:

Assessing Residual Functional Capcity In Initial Claims, 1996 WL 374184, at *1 (July 2,

1996). The ALJ must assess a plaintiff's ability "to perform each of seven strength

demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. at *5. In

addition, the ALJ "must discuss the individual's ability to perform sustained work

activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a

day, for 5 days a week, or an equivalent work schedule), and describe the maximum

amount of each work-related activity the individual can perform . . . ." Id. at *7 (internal

footnote omitted).

Here, the ALJ afforded minimal weight to the only medical source statement

completed by an acceptable medical source. T at 18-19. The only other medical

evidence given anything more than minimal weight by the ALJ was Dr. Humphrey's

March 2013 treatment note which only addressed limitations on plaintiff's ability to lift,

drive, and use his right elbow. Id. at 19. Moreover, this treatment note was written

before plaintiff underwent either of his elbow surgeries. Further, the ALJ accorded Dr.

Tesoriero's April 2013 treatment note indicating limitations on excessive lifting or

extended sitting significant weight. Id. at 18. He similarly granted significant weight to

Mr. Harning's April 2013 statement wherein he reported that plaintiff was restricted from

lifting greater than twenty pounds, driving for longer than thirty minutes, and repetitive

use of the right extremity for heavy lifting. Id. Dr. Humphrey's March 2013 medical

treatment note, Dr. Tesoriero's April 2013 treatment note, and Mr. Harning's April 2013 intake note do not amount to substantial evidence to support the ALJ's opined RFC. First, although Dr. Humphrey is a treating physician and the ALJ reasonably accorded great weight to his March 2013 statement, this statement does not reach findings regarding all of plaintiff's functional limitations; for instance, it does not discuss plaintiffs ability to sit, stand, walk, stoop, or use his hands. Further, Dr. Tesoriero's statements, although they can be used to support the RFC insofar as they can reflect on the severity of plaintiff's impairments, as a chiropractor, Dr. Tesoriero's findings do not amount to substantial evidence to support an RFC assessment. Colon, 2010 WL 2925969, at *3; SSR 06-03p, 2006 WL 2329939. Moreover, although Dr. Tesoriero's treatment note indicates limitations on excessive lifting or extended sitting, Dr. Tesoriero's treatment note did not define "excessive," and did not reach findings regarding how plaintiff's back pain affects his ability to complete other activities necessary to perform basic work activities. Id. Finally, insofar as the ALJ relied on Mr. Harning's findings, as noted, Mr. Harning is a non-medical source. Further, the physical restrictions set forth in Mr. Harning's April 2013 report were merely a regurgitation of Dr. Humphrey's March 2013 treatment notes, as Mr. Harning's listed limitations are nearly identical to those opined by Dr. Humphrey and because plaintiff's application for vocational services required him to submit his medical records. T. at 233, 369.[13] Thus, it does not appear that Mr. Harning's April 2013 report insofar as it indicates specific

_____

[13] The application for vocational services required plaintiff to submit his medical records. T at 233. The orientation/intake form indicated that plaintiff submitted "a copy of the updated medical report(s) concerning his injury as well as orthopedic limitations and restrictions." Id. at 369.

physical limitations should be entitled to any of the special weight discussed in SSR 06-03p, as it does not appear to be based on any "special knowledge of the individual" that Mr. Harning may have had.  <u>See</u> SSR 06-03p.

Accordingly, as the ALJ's RFC is not supported by substantial evidence, because (1) the ALJ failed to meet his duty to recontact the treating physician after determining that there were either conflicts in Dr. Humphrey's findings or a lack of support, and (2) upon assigning Dr. Humphrey's MSS little weight, there is not substantial evidence in the record, based on findings from acceptable medical sources, to amount to substantial evidence supporting in the ALJ's RFC assessment.

### v. MSS Formatting Concerns

In discussing Dr. Humphrey's MSS, the ALJ observed that "the design of the [MSS] format only allows an opinion that assigns some limitation, whether its never, rarely, occasionally, and frequently."  T at 19.  Thus, the ALJ suggests that the MSS form Dr. Humphrey used necessarily requires the user to select some level of restriction, as there is no selection indicating that the patient has no limitation in completing the listed activities.  Plaintiff argues that "'never' would seem to be no limitation, thereby undermining the ALJ's underlying assumption that the form's questions only allow for and indication of some limitation."  Dkt. No. 10 at 8.  A plain reading of the MSS form reveals that the "never" option is actually the most restrictive option – such as the claimant can never climb ladders –  whereas the least restrictive choice is "frequently," which the form provides means that the claimant could perform

that task "34% to 66% of an 8-hour working day."  Id.  Thus, the ALJ correctly notes that

Dr. Humphrey's MSS does not allow the provider to select choose no limitation, or an

ability to perform a task greater than 66% of a working day.  Id.

Despite the possible shortcomings of this MSS, light work does not require a

claimant to be able to perform these listed tasks, such as use of hands, at a rate that is

greater than "frequently."  See SSR 83-14: Titles II and XVI: Capability To Do Other

Work – The Medical-Vocational Rules as a Framework for Evaluating a Combination of

Exertional and Nonexertional Impairments ("Unlike unskilled sedentary work, many

unskilled light jobs do not entail fine use of the fingers.  Rather, they require gross use

of the hands to grasp, hold, and turn objects"); see also SSR 83-10: Titles II and XVI:

Determining Capability to Do Other Work – The Medical-Vocational Rules of Appendix

2, 1983 WL 21251 (1983).  Thus, the necessarily implication of choosing "frequently"

indicates that the claimant has either no limitation or a mild limitation in performing that

activity.  Despite the ALJ's dialogue regarding Dr. Humphrey's MSS form, it does not

appear that the ALJ lessened the weight he accorded to the opinion because of this

formatting frustration.  However, on remand, it is recommended that the ALJ be

instructed to obtain an MSS from Dr. Humphrey that includes an explanation of the

provider's opined statements of limitation.

Next, plaintiff points out that the ALJ incorrectly discredited Dr. Humphrey's MSS

because it was a "check-box" form.  Courts in this Circuit have acknowledged that a

medical source statement that is merely a check box form that does not explain the

reasoning behind the choices or the objective testing upon which it is based is entitled

to lesser weight than a MSS that explains the findings of limitation.  <u>See</u> <u>also</u> <u>Halloran</u>, 362 F.3d at 31, n.2. (noting that a treating physician's medical source statement which was a "standardized, multiple choice" form that allows "four uninformative answers" regarding the claimant's ability to sit – "'no limitation'; 'up to 8 hours per day'; 'up to 6 hours per day'; and 'less than 6 hours per day'" – was "not particularly informative" and only "marginally useful for purposes of creating a meaningful and reviewable factual record).

Thus, although ALJ inferred that the check-box form, which did not include any additional medical explanation, may have been entitled to lesser weight than an MSS that included greater limitation, any such inference or commentary does not amount to reversible error.  <u>Halloran</u>, 362 F.3d at 31, n.2.   Moreover, although the ALJ pointed out that Dr. Humphrey's opinions were provided on a check box form, it does not appear that the ALJ rejected the MSS solely because of its formatting, but merely as an indication that the MSS did not include explanations for the selected limitations.

### 2.  Vocational Expert

The "appropriateness of 'applying the grid guidelines and the necessity for expert testimony must be determined on a case-by-base basis.'"  <u>Sipe v. Astrue</u>, 873 F. Supp. 2d 471, 480 (N.D.N.Y. 2012) (quoting <u>Webb v. Astrue</u>, 11-CV-94 (GLS), 2012 WL 589660, at *5 (N.D.N.Y. Feb. 22, 2012).  Where a claimant's work capacity is "significantly diminished" by non-exertional impairments beyond that caused by his or her exertional impairment, then the use of the Grids may be an inappropriate method of

determining a claimant's residual functional capacity and the ALJ may be required to consult a vocational expert. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604-605 (2d Cir. 1986). The impairment must be significant because "the mere existence of a non-exertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." Roma v. Astrue, 468 F' Appx. 16, 21 (2d Cir. 2012) (quoting Bapp, 802 F.2d at 603). A claimant's work capacity is "'significantly diminished' if there is an 'additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" Id. (quoting Bapp, 802 F.2d at 606).

Here, the ALJ used the Grids in reaching his disability determination. T at 20-21. Specifically, the ALJ concluded that a finding of "not disabled" would be directed by Medical-Vocational Rule 201.21 and 202.14 based on plaintiff's age, education, work experience if plaintiff had the ability to perform the full range of light work. T at 20. The ALJ acknowledged that plaintiff is limited to frequent reaching with his nondominant right upper extremity, but has no limits with his dominant upper left extremity and can use both hands to handle, finger, and feel. Id. The ALJ concluded that plaintiff's nonexertional limitations "have little or no effect on the occupational base of unskilled light work." Thus, the ALJ determined that reliance on the Grids is appropriate because his nonexertional limitations do not significantly diminish his ability to perform the full range of light work. Id. at 20-21.

Plaintiff contends that the ALJ erred because his work capacity is significantly diminished by non-exertional impairments – he could rarely stoop or reach. Dkt. No. 10

at 13 (citing T at 374-75). Here, as the undersigned finds that reassessment of plaintiff's RFC is needed, such a finding necessarily affects the ALJ's step five analysis. Accordingly, it is recommended that, following reassessment of plaintiff's RFC on remand, should the ALJ determine that plaintiff's nonexertional limitations "so narrow[] [plaintiff's] possible range of work as to deprive him of a meaningful employment opportunity," testimony from a vocational expert will be required. Bapp, 802 F.2d at 605-06.

### 3. Age Category

Plaintiff also argues that the ALJ did not consider the fact that he turned fifty on November 3, 2013, "which changed his age category from a 'younger individual' to an 'individual approaching advanced age.'" Dkt. No. 10 at 13. Plaintiff's contention is plainly contradicted by the ALJ's determination. T at 19-20. Citing 20 C.F.R. §§ 404.1563, 416.963, the ALJ noted that plaintiff was in the younger individual category at his onset date and "subsequently changed age category to closely approaching advanced age." T. at 19. Thus, as the ALJ properly considered plaintiff's age category, the ALJ committed no error regarding plaintiff's change of age category in rendering his determination, the ALJ committed no error on this ground.

### III. Conclusion

**WHEREFORE**, for the reasons stated above, it is hereby

**RECOMMENDED** that the Commissioner's motion for judgment on the pleadings

39

(Dkt. No. 11) be **DENIED**, that plaintiff's motion for judgment on the pleadings (Dkt. No. 10) be **GRANTED**, and that the Commissioner's decision denying disability benefits be **REMANDED**, pursuant to 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this Report-Recommendation and Order; and it is

     **ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

     Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **fourteen (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED**.

Dated: March 9, 2016
     Albany, New York

                                     Christian F. Hummel
                                     U.S. Magistrate Judge